19-1457, the State of Richie Majors et al. v. Roger Gerlach et al. Oral argument, 15 minutes for the plaintiffs, 15 minutes to be shared by the defendants. Mr. Weininger for the appellants. Thank you. May it please the Court, Daniel Weininger on behalf of the appellants in this case. I'd like to reserve three minutes for rebuttal. All right. Michigan was the first common law jurisdiction to abolish capital punishment in 1847. Yet when Richie Majors was incarcerated in the Michigan Department of Corrections, it was tantamount to a death sentence. Richie Majors had an obviously serious medical condition under the deliberate indifference standard. And that is a condition that the defendants knew about. The medical record in this case is replete with references from the beginning of Majors' intake at Michigan Department of Corrections that he had notified them that he had MS. And even prior to that point in his quick incarceration in Wayne County Jail, he informed them too in March of 2010 that he had a history of MS. And the record indicates that he had a history of MS stretching back to 1993 and stretching back to his incarceration in the Minnesota Department of Corrections. And the problem here is that that obviously serious medical condition was never treated. I referenced opposing counsel's briefs and there is an attempt to couch this case as one between dueling contentions over the adequacy of the care. That's not our position. There was no care. There was no care when it came to the multiple sclerosis condition. Now your client was initially incarcerated in Minnesota, is that right? That is correct. And he did receive treatment for multiple sclerosis there, is that right? That is correct. He received a drug called Rebif.  Subsequently, Your Honor. And that's where the problem began? That's correct. Now, I don't know a lot about multiple sclerosis, but it does have periods of flare-ups and when it's in remission and that kind of thing in terms of the symptoms. Is that right? There's four types of categories of MS. One of them is a relapse and remission sort of symptomology. Okay. When your client was incarcerated in Michigan, was he experiencing any acute symptoms or was that a period of relative remission or not having these acute episodes? The record from the Michigan Department of Corrections indicates he had several relapses from 2010 through 2014. And again, he began his incarceration in April of 2010. He finally received a diagnostic MRI, which is how you eventually evaluate whether a patient has MS. And he received that MRI four and a half years later. And in between, there was zero treatment. And not only that was there zero treatment, there was no effort made to even diagnose the disease. There's mention of it by his medical providers that he had MS, yet they did not take the basic step of getting him an MRI to even diagnose what he had. Well, it seems that looking at the record that there was some delay in getting the MRI because the prison officials or nurses, doctors were waiting on records from Minnesota. Is that fair to say what was happening? No. In the record there, if you look at the portions, I don't believe the full transcript is there, but portions of the transcript from the estate, his sister, she testified there were multiple efforts to get the records from Minnesota in the hands of the Michigan Department of Corrections. Efforts by the family to give the records. Correct. What's in the record as far as what the prison officials or medical personnel at the prison in Michigan did to get the records from Minnesota? That appears to be unclear. They knew, the record indicates clearly that they knew he was in the Minnesota Department of Corrections. They knew he was there for a certain period of time. They knew that he was treated for MS because majors knew the drug that he received, at least by chemical name, which is interferon. He informed them of that. They had that at his intake back when he first came in to Michigan Department of Corrections. And nothing was done. There's indications in the record that the doctors wanted to get medical records and we should eventually get him an MRI, but it was never done. It was never followed up. And again, there are countless instances of him relapsing severely, severely, in the Michigan Department of Corrections. He had indications of which the physician defendants could not have known one way or another because they never diagnosed him. I'd like to focus in on Defendant Kakani. Sure. She was the physician assistant at the Gus Harrison facility? Correct. Okay. Now, based on my review, it looks like that Mr. Majors did not file a kite for about a year, it seems like, because he was seen by Kakani, looks like May the 21st, 2013, and then I don't have a record of him sending a kite until April of 2014. Is that correct? That is true. There isn't a record of a kite, but the record does indicate several instances where he made complaints to treating staff about his condition. First being, when he first even got into the Gus Harrison Correctional Facility in December 2012, and I can read from the record, this is at page ID 2100 in the record, indicates that Majors has declined mentally and physically. He has difficulty walking. His legs often go out from under him and that his hands are numb. Telltale signs of MS that Kakani should have known about, that she did know about, because she had his MDOC medical records. And his MDOC medical records even prior to his incarceration at Gus Harrison, you know what those said right prior to then? MS worsening on November 12th, 2012, right before he became incarcerated at Gus Harrison. February 17th, 2012, may be having symptoms of MS. August 18th, 2011, worsening MS, would like prescription injections and back for MS. So it's hard for Defendant Kakani to say she didn't know what was going on, didn't know he had MS or didn't know that he was prone to relapses, when the medical record that she had was clear. There was a history there. And not only that, when he actually was there, again, we have that December 2012 complaint. It wasn't an official kite, but again, his medical providers definitely knew about it. He complained again in January 2013, says he's not receiving services from health care about his MS. He reported signs and symptoms in February 2013 consistent with MS. I mean, the record is replete with his time before Kakani that he had this symptomology. And she did nothing. She referred him to an optometrist. Did you agree that as a result of her meeting with Mr. Majors on May the 21st, 2013, that she ordered the records from Minnesota coming out of that meeting? I don't know if that is necessarily clear that she did. I think what she did order was an MRI and neurology consult to confirm diagnosis. But I don't know, and that's on page, I think that's 2188 of the record. I may have that. I don't think, though, she actually said get us the records from MNDOC. There is an affidavit from her in which she says, I noted that he was in apparent remission and requested some additional medical records that were not in his chart and MRI report and neurology consult note from Minnesota. Then it's possible that she very well did. Those notes, though, never made it to the Michigan Department of Corrections. She never received them. And she never followed up. And the other problem is that there is this contention in the record that the physician defendants raise and, to a certain extent, the nurse defendants. And that is that Mr. Majors was in remission. The only problem with that is that you don't know if he's in remission if you don't know the disease that he's suffering from. If you haven't diagnosed it. Did you ever hear that the physician assistants had the authority to order an MRI? That's a very good point. They did not. But what I would say is that if you look at precedent from the Seventh Circuit, quite analogous to this case, the nurse defendants have an independent obligation under the Eighth Amendment to ensure that an inmate has adequate care. And in this case, it's not even adequate care. It's any care whatsoever addressing this very serious condition. And just as a personal note, as someone who does these cases quite a bit, I think it would be a grave mistake to enshrine in the Eighth Amendment what the nurse defendants are positing, which is essentially a Nuremberg defense for the Eighth Amendment. Separate and apart from the nurses, the physician assistants that are defendants, I guess there's nothing in the briefs anywhere as to what the professional responsibility of physician assistants are, what level of care they're responsible for providing, since they're under the direction, I assume, of a physician. And I would assume that Michigan state law would indicate what the professional responsibility of physician assistants would be. What is the standard of care that's applicable from a malpractice standpoint for physician assistants in Michigan? I do not know the answer to that question. What I would say here is that this case deals with a situation that's way above and beyond what medical malpractice is. I mean, this is deliberate indifference. It's an entire different level. Well, yeah, that's true. This is deliberate indifference, but it would be necessary to know what the responsibility legally of physician assistants would be, since you have named them as defendants. What we would say, again, in terms of their responsibilities, is this court could very easily take a look at the guidance that the National Multiple Sclerosis Society puts forth as to the standard of care for multiple sclerosis, as does the Mayo Clinic. And that is three things. It's a three-pronged approach that every medical provider, whether physician assistant or doctor, it should follow. And that is, the moment you have a diagnosis, which, again, these defendants never pursued, is, number one, early treatment with drugs, such as Rebif and Avon. There would be state statutes or state regulatory provisions governing physician assistants in the state of Michigan. We don't really have to guess about that. In terms of whether they can order an MRI or not? Yes. And what care they're authorized to, what level of professional judgment they are responsible for exercising. Even assuming, and again, I plead, I don't know the exact contours of what a physician's assistant can do, but even assuming they couldn't directly order the MRI, they should have at least made the recommendation to a physician at Corison to give the MRI. And that was never done. They never pursued, either themselves or recommending to a physician, that an MRI should be given to majors. And an MRI is the way. Was the physician at the Gus Harrison facility sued? I'm sorry, what's that? Did your client sue, did you sue the physician at the Gus Harrison facility? From medical record, it doesn't appear that there was actually a physician, an MD or a DO on site. The go-to person at Gus Harrison was physician assistant Kakani. She's the one who made the medical decisions there. And when it came to, for example, treatment at West Shoreline with Lenore, he had to get approval from Corison higher-ups to administer the Evonics. So there's no evidence that Kakani had a doctor that she reported to? We know that she conferred on June 4th, I'm sorry, on June 11th, 2014, with someone, a physician who's not named in the record. But after that, there was, again, no measures taken to even as little as diagnose majors with the condition he had. And I'd remind the court, he was exhibiting symptoms at certain times of stroke. And they did nothing. They had no idea what he was suffering from. And yet, if we take a look at West Shoreline, even more so, he had drooping mouth. He was sleeping on a bench outside a cell. Even the correction officers themselves reported to the medical providers and the nurses, you've got to do something about this guy because he's looking really bad. And that's around August of 2014. The main point here is that nothing was done. And the conventional treatment of multiple sclerosis is early treatment with Rebif or Evonics, which wasn't done. Ongoing treatment so long as the individual is tolerant. If not, we switch them to a different drug. And three, vigilance. None of those measures were taken. And again, these are standards that are laid out by the Mayo Clinic and the National Multiple Sclerosis Society. I encourage the court to take a look at it. Let me ask you about Lenore. What are you claiming Lenore did wrong? Our claim is that Lenore received on July 9, 2014, an inter-system transfer summary. And that inter-system transfer summary showed an entire history in the Michigan Department of Corrections and it showed a history of significant relapses. And Lenore had that information. Majors came into West Shoreline on July 15, 2014. About a week later, he's complaining about his MS symptomology. And it takes Lenore a month from majors getting there to an actual review, just seeing majors. And at the time, majors was exhibiting symptoms that could have been stroke. And nothing was done. And even after that point, even after seeing majors on August 12, 2014, it takes a full other month to get him an MRI. But isn't there action made by Lenore, though, pretty quickly after she saw majors to get the ball rolling to get the MRI? Well, I would beg to differ. After the August 12, 2014 meeting, it takes about almost another month to even have a conversation with the higher-ups at Khorizon that this guy just even needs the bare minimum of an MRI. To diagnose a condition he was telling them that he had for four years. And again, these were signs of stroke. Lenore took two months to get him an MRI. They had no idea what he was suffering from. They had no idea. I know you're out of time, but you didn't address the statute of limitations. Do you want us to just rely on your brief there, or do you have anything to add? I would, if Your Honor would indulge me for a brief minute. All right. Why don't you go ahead. Our position there is quite simple. Number one is that Ruiz-Bueno governs the statute of limitations analysis. The district judge resorted to state law. And the clear case law in this circuit and across the country is that the accrual of the statute of limitations is governed by federal law, not state law. And looking to federal law in this circuit, the calculation is under Ruiz-Bueno. And even if this court decided not to follow Ruiz-Bueno from this circuit, there is plenty of case law even from the United States Supreme Court, U.S. v. Kubrick. Again, that's in the FCTA context, but it looks like the physician defendants support that analysis, which is that you look at the time period the plaintiff knew about the injury and the cause, which means the statute of limitations does not begin to run until the plaintiff knows about the diagnosis of the preexisting symptomology. And that didn't happen in this case until September 29th or 30th of 2014. And if that's the date we use, all the claims against all the defendants come back into this case. Thank you. Thank you. Good morning, Your Honors. If it pleases the Court, Ronald W. Chapman on behalf of P.A. Kakani and P.A. Lenore. Let me address the statute of limitations. How are you dividing your time? I'm going to do ten minutes, Your Honor, and then the MDLC will do five, and I may even stop less than ten and give them a little more. All right. We decided that earlier today when we were outside. Let's talk about the statute of limitations issue first. The first thing to recognize about that is the accrual period starts when the individual, when the injury occurs. So in this case, the injury arguably is I have MS, I'm not getting treatment. So an argument that occurred in 2011, 2012, 2013. Mr. Majors. But it's not when the injury occurs. It's when the injury occurs and the individual knows about the injury. But the individual. Correct. But the individual knows about it. In other words, he has to discover the injury or the condition. In addition to the condition being present, the person has to discover the injury or the condition. And that's when the time begins, for accrual purposes, the time begins to run. Correct? I would agree with that. But my counter to that is the injury here or the act is I have MS, you're not giving me medication. The injury, the act, all of it's together. He knows that from 2011, 2012. His argument is gentlemen or ladies, I have MS. I need medication because I got it in a different institution two and a half years ago. So he knows this all along. He could file kites. He could file pro se. He could hire an attorney. We get hundreds a year. So there was no risk to him. And the argument being made that, well, he may not have been of the mental acuity to recognize that, was never made. There was no argument in the motion to dismiss when Judge Goldsmith made the ruling that the statute of limitations started, in May of 2013, that he was incompetent at the period toll. And in the motion for reconsideration when they raised that, the judge said again. He said, look, I consider that issue waived. One, you never raised it in the response to the motion to dismiss. And two, in the motion for reconsideration, you don't give me any evidence whatsoever that somehow he was incompetent and didn't know his rights. That's the only thing he could do was toll it. And there's been no argument made of that. So in our position, the case starts, I think Judge Goldsmith articulates that well in the motion to dismiss and in the response, or addressing the reconsideration, that it starts in May of 2013. So then we get to Ms. Caccone. So Ms. Caccone, he's transferred to Gus Harrison. Ms. Caccone is a PA. To answer Judge Clay's concerns, a PA has the authority to order or to request an MRI. The way it works, just like with insurance and everything else, if a physician, a PA, whatever, wants a test, they fill out what's called a 407. They detail the reasons why they should have this. And then they submit it to Utilization Review. And the Utilization Review looks at it, makes a decision of is there medical necessity for this? Does the medical facts justify this? And then they either accept it or they give what's called an alternative plan. And then that goes back to the PA and they can do whatever. The PA also has a supervising physician, which they could go to the supervising physician and say, hey, we want this or need this or whatever. So I'm not here to make an argument that the PA, either Ms. Caccone or Lenore, didn't have the authority to do whatever they felt in their medical judgment they needed to do. They could have done it. But here's the fact. The first time Ms. Caccone sees him is on May 21, 2013. He says, I have MS, completely in remission, no problems going on. And contrary to what counsel says, the MS Society does not recommend biologics prophylactically or simply because you have MS. Now, there's no experts on behalf of the appellant here. But you could go to Dr. Stoltz, who is an MD, family practice, and that would be pages of the record 1232 to 1248. Or to Dr. Ranganathan, who is a neurologist who specializes in MS, pages 1249 to 1259. And you will see their expert reports. Both of them opine, and particularly Dr. Ranganathan, he was not in a relapsing state that would require potentially biologics until August of 2014. So in May of 2013 to May of 2014, he never files a kite, comes in to see Ms. Caccone and says, I need this or I need that. He files a kite in late April of 2014. He sees Ms. Caccone a few days after that, I think maybe eight or nine days after that. She makes a comment in her record that she doesn't have all the records necessary. She's going to obtain these records and start an analysis. And then he gets transferred. Now, here's an interesting thing about transfer. Nobody knows when someone is going to be transferred. That's a security issue. It's not advanced to the doctor or whatever. Corrections knows that they're going to do that. So he's transferred. The new physician, physician assistant, mid-level, that takes over is Lenore. What does he do? He meets him in August. He talks to him, identifies the problem. He talks about how he's having these concerns. He puts in a 407 for an MRI. He gets the MRI. He gets the MRI reviewed by a professional. He obtains, which are in the system now, and he looks at the Minnesota records, and he makes the diagnosis that he should be on some form of biologic. He does that in 49 days. You can't do it that fast in the civilian world. Why do we put a different standard upon people in corrections and say, well, you should have done this in 10 days or 12 days? And remember the Blackboard standard here. Going back to Kakani, the issue is because there was not an obvious need, he wasn't relapsing. He was remitting. You don't treat MS when it's remitting except for if there's an acute episode, you give them a course of steroids, basically Prendizone, for about four or five days. It calms them down, and they move on. In most MS patients, that's all they do because they may not have a relapse for two, three years. What's the interferon then required? Well, it's required when your relapses become so close together that now the decision is you should be on a biologic. Because remember, Your Honor, biologics have a significant number of problems that they also put on. It is a very, very powerful drug that alters the system completely. So you do not give that easily. In fact, the McDonald Criteria, which is promoted by the MS Society, says that before you give biologics, you have to have an MRI that shows demyelinating disease in two regions, and you have to have a lumbar puncture that shows alacronal bands, or you have to have two to three remissions within a six-month period. He didn't even meet that criteria until August, per our expert. Plaintiffs have chosen not to have any experts in this case. And that expert report says in August is when he needed to be placed on biologics. He received his biologics when all this was done in late September and continued to receive them all the way through. We're looking at this not as a medical malpractice case. We're looking at this as a deliberate indifference. So when you look at Kakani, you have to say, okay, maybe Kakani messed up and should have ordered something. But under Blackmore, since it's not an obvious, you have to say, was there any damage? Well, there was no damage. There was no additional damage. No testimony that says this MS progressed significantly during this or caused any of these problems. Then you go to Lenore. Now there's evidence that he's having these relapses more often. And then the standard is, how fast did you act? Were you deliberately indifferent? Did you ignore it? Well, how can you say that when you order an MRI almost immediately, send it up the chain, it gets approved, it gets sent from prison to the MRI, the MRI is reviewed by the neurologist, it's confirmed that he has demyelinating disease. We know he has at least two relapses now within a six-month period of time. You put him on biologics and you do that in 49 days. You can't get any better than that. I would argue even under medical malpractice standard, that's not medical malpractice. That's good medical care. In fact, Judge Goldsmith argues it would have been gross negligence for Kakani or Lenore to just put him on biologics because he says somebody else put him on. And remember, he was out of the system for two years. There's no evidence. He testified, or didn't testify, in the record indicates he was not on any biologics for that two-year period of time. And then he came into the facility. So with that, I would yield any additional time I have to the MDOC. Thank you, Your Honors. All right. Good morning, Your Honors. Judge, may it please the Court. O.G. Reasons on behalf of the MDOC Nurse Defendants. First, to discuss the statute of limitations. Plaintiff's argument has seemed to kind of morph from Ruiz Bueno says that the personal representative, it's their discovery that determines when the statute runs, to now saying Ruiz Bueno says it's the injury and cause of injury that decides when the statute runs. Both those arguments fail. As Judge Goldsmith said, Ruiz Bueno didn't address any kind of personal representative versus injured party discovery. It didn't address that. It addressed does it run when the injured person knows the cause or the cause and the person who caused the injury. That was a discussion. No discussion about whose discovery it was between personal rep or decedent. That was not analyzed in that case and to try to twist Ruiz Bueno to say it was is, as this report put it, a perversion of the rule. As to the second argument that the decedent's discovery of his injury and what caused his injury, plaintiffs argue that occurred in December of 2014. The record shows that Mr. Majors constantly, and I'll say this, he set several kites. He said basically, I have MS, I need this drug. If you don't give me this drug, it's going to hurt me. He knew he had MS. He said he knew he wanted a drug. He knew it harmed him not getting the drug. He didn't discover that when the MRI came back. He's had MS for I think plaintiff's counsel says since the 90s. He knows what MS does. He knows the drugs he needs. So he's well aware of his claim, not when a December 2014 MRI comes back. As to the nurse defendants, their role in this, first we have John Solomonson and Gus Harrison. First time he saw Mr. Majors was November of 2013. He treated him for constipation. What the record showed during that treatment in Mr. Majors' record was a May 21st visit with physician's assistant Kakami which showed that Mr. Majors' MS was in remission. So nurse Solomonson shows a patient who has a history of MS but that it's in remission and there's no complaints. Go to April and May of 2014. Mr. Solomonson gets several kites about Mr. Majors' MS. What does he do? He refers Mr. Majors to a physician's assistant who can look at these problems. In May of 30th, 2014, Mr. Majors saw P.A. Kakami. Next to Karen Rich at West Shoreline, she saw Mr. Majors twice. First in July of 14, he complained about MS. What does he do? What does she do? She refers him to a physician's assistant who can treat MS. Next, Dorinda Blum at West Shoreline. She saw Mr. Majors multiple times in 2014. What does she do? She refers him to a physician's assistant who can treat the MS. She also treats his constipation. She gives him a wheelchair. She does things a nurse can do, gives him medications a nurse can give and refers him to a proper medical authority for other things. We also have Joel Everston at West Shoreline. Same thing. He got kites from Mr. Majors. He referred him to a physician's assistant who can address these concerns. When Mr. Majors arrived at West Shoreline, he sent kites about his MS. He was sent to a medical professional. Medical records were ordered. MRI was ordered. A doctor reviewed the MRI. Injections were ordered, and the nurses gave the injections. They did their job. They provided affidavits. If they have no expertise, it's beyond their scope to address MS concerns besides referring them to a medical professional. Plaintiff relies on Haydix v. Caruso in Michigan and Berry v. Peterson, 7th Circuit. If you read those cases, there are completely different facts in those cases. Haydix v. Caruso, when the court says the nurses can't just stand by, the facts of that was a screaming, psychotic man chained to a bed for four days straight in no air conditioning, in 100-degree heat. And they said the nurses can't just sit there and watch that. They've got to jump in. That's a far cry from this case where they're getting a kite from a patient and referring them to a medical professional. Is there any evidence of any kite being ignored? The only thing on one of Mr. Solomonson's, he said, I've got this information, I referred you, further kites aren't going to expedite it. That's the only time he gives maybe a flippant response, but Mr. Majors sees the PA within a couple weeks of that kite. My time is up. Thank you. Mr. Barlow? A quick few points just to discuss what Carizon's counsel said. I'm pointing to their brief, page 25 of their brief. That's a CMECF page 25. Again, they analogize this case to the Federal Tort Claims Act. And this is their words, not mine. A medical malpractice claim accrues when the victim knows both the existence and the cause of death. That's one of the very theories we're positing for statute of limitations as well. We seem to be on the same page. That's their brief, page 25. With respect to the issue of prescribing something prophylactically, I don't want to get too far into, again, competing views on how to treat MS. Because in this case, none of those treatments happened. Nothing happened with respect to treatment of MS. And again, counsel's here. He has a position to argue. But there was no treatment done for MS. So when he makes the statement that the National Multiple Sclerosis Society says you don't give drugs prophylactically, that's absolutely true. That's why you diagnose them. That's why you get them an MRI, which was not done in this case over four years. So that's a tremendous issue, the fact that this individual, Mr. Majors, is having stroke-like symptomology. And not only is he not getting an MRI, nothing is being done. So when counsel makes the representation that even in general society, the timing would be great, if someone is having symptoms of a stroke, you don't wait two months to confirm what's going on. You get them help now. And instead, it took four years to simply get him an MRI to determine what he had. And with respect to the Attorney General's position, that somehow Majors knew he had MS and that somehow that should affect the statute of limitations, you can't have your cake and eat it too. If the physicians are claiming they didn't know what he had until they diagnosed him, you can't charge Majors with the responsibility of knowing what he had. He could have been having a stroke. Yes, he knew he had a history of MS. But what was he actually experiencing at the time in MDOC, he did not know. That's the very purpose of why the Multiple Sclerosis Society says you get a confirmatory MRI to determine does this patient have MS, does this patient not have MS. It was never done. With respect to Mr. Majors not taking his drugs between the period of time he was incarcerated with Minnesota and Michigan, Mr. Majors was an African-American male from Detroit. His family history, which is in the record, shows that they did not come from the greatest of family circumstances. And he did not have insurance. So to claim that he somehow should have been on treatment for MS when he was outside of Minnesota Department of Corrections is, to me, ignoring the simple fact that the man didn't have health insurance. And again, with respect to the expert witnesses, I would just like to say the District Court never considered expert witnesses in this case. So you can't consider the expert witnesses in this case. And besides the fact that the expert testimony in this case is entirely worthless because Dr. Stoltz has no experience whatsoever in neurology. And Dr. Raganathan's opinion flies in the face of the standard of care that the National Multiple Sclerosis Society puts forth in this case. Thank you so much. Thank you, and the case is submitted.